# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SKYLAR M. SIMMONS,**
**a minor by his mother, INEZ JAMES,**

               **Plaintiff,**

          **-vs-**                             **Case No. 04-C-381**

**JO ANNE BARNHART,**
**Commissioner of Social Security,**

               **Defendant.**

---

# DECISION AND ORDER

---

        The minor plaintiff, Skylar M. Simmons ("Simmons") by his mother, Inez James ("James"), applied for supplemental security income ("SSI") benefits. Simmons, born on September 25, 2000, alleged that his disability due to asthma and bronchitis began as of October 15, 2000, when he was less than 1-month-old. Simmons's application was denied initially and upon reconsideration. Thereafter, following a July 15, 2003, hearing before an Administrative Law Judge ("ALJ"),[1] the ALJ issued a decision denying Simmons's application for SSI. The ALJ's November 28, 2003, decision became the final decision of the Commissioner of the Social Security Administration ("Commissioner") when the Appeals Council denied Simmons's request for review. On April 16, 2004, Simmons filed this action,

---

[1]Simmons was represented by counsel at the administrative hearing. James appeared and testified.

pursuant to 42 U.S.C. § 405(g), appealing the Commissioner's final decision. On August 24, 2004, the Court granted Simmons's request to proceed *in forma pauperis* on his appeal.

Simmons raises several interrelated arguments before this Court. He maintains that the ALJ did not properly evaluate the record in assessing whether Simmons's conditions met § 103.03 of the Listing of Impairments ("Listing") for asthma. Simmons asserts that the ALJ did not properly apply the Commissioner's standards regarding the assessments of opinions by treating sources and did not follow the Commissioner's credibility standards in evaluating James's testimony. Further, Simmons maintains that the ALJ failed to properly evaluate the medical and functional equivalence to the Listings.

*Standard of Review*

The Social Security Act limits the scope of judicial review, providing that the Social Security Administration's ("SSA") findings of fact are conclusive so long as substantial evidence supports them and no error of law occurred. *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001)(citing 42 U.S.C. § 405(g)). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must "build a logical bridge from the evidence to his conclusion," *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), and "must confront the evidence that does not support his conclusion and explain why it was rejected," *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004), but he need not "provide a 'complete written evaluation of every piece of testimony and

2

evidence.'" *Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005) (quoting *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)). The Court will "conduct a critical review of the evidence," considering both the evidence that supports, as well as the evidence that detracts from the Commissioner's decision, which "cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (citations omitted).

*Regulatory Framework*

In August of 1996, Congress enacted the 1996 Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"). The PRWORA set forth a new standard for determining whether a child is disabled. Under the PRWORA:

> [a]n individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked or severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i) (1997); *see Williams v. Apfel*, 179 F.3d 1066, 1068 n. 3 (7th Cir. 1999); *Hickman v. Apfel*, 187 F.3d 683, 685 n. 2 (7th Cir. 1999).

Under the regulatory scheme established by the SSA, a three-step process is employed to decide whether a child is disabled.[2] First, if a child is engaged in substantial

---

[2]On September 11, 2000, the SSA published final regulations implementing PRWORA (the "Final Rules"), effective January 2, 2001. 65 Fed. Reg. at 54,747 (Sept. 11, 2000)

3

gainful activity, his claim is denied. 20 C.F.R. § 416.924(a).[3] Second, if the child does not have a medically determinable "severe" impairment or combination of impairments, then his claim is denied. *Id.* Finally, for a child to be considered disabled, the child's impairment(s) must meet, medically equal, or functionally equal the requirements of a listed impairment in 20 C.F.R. Part 404, Subpt. P, App. 1. *Id.* To find an impairment functionally equivalent to a listing, an ALJ must access the impact of the impairment on the child's functioning in six age-appropriate domains and find an "extreme" limitation in one domain or a "marked" limitation in two domains. *See* 20 C.F.R. §416.926a(a).

There are six domains of functioning: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b). The regulations define a "marked" limitation as resulting when the "impairment(s) interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(ii). Day-to-day functioning may be seriously limited when an impairment or impairments limit only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *Id.* "Marked" limitation is also defined as a limitation that is "more than moderate" but "less than extreme." *Id.* As for an "extreme" limitation, the regulations require that the impairment or

---

[3]All citations are to April 1, 2003, version of Parts 400 to 499 of Title 20 of the Code of Federal Regulations in effect as of the date of the ALJ's decision.

impairments interfere very seriously with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). Day-to-day functioning may be considered very seriously limited when the impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *Id.* Obviously, an "extreme" limitation also means a limitation that is "more than marked." *Id.* On the other hand, "extreme" limitation does not necessarily mean a total lack or loss of ability to function. *Id.*

*The ALJ's Decision*

The ALJ found that Simmons is not currently engaged in substantial gainful activity and that his asthma impairment is severe as defined in the Social Security Act, but that it does not singularly or in combination, meet or medically equal the requirements of any section of the Listing of Impairments in Part P, Subpart P, Appendix 1, Regulation No. 4. (Tr. 18.) The ALJ found that Simmons does not exhibit any limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects and caring for oneself; and demonstrates a less than marked to marked limitation in the area of physical health and well-being. (*Id.*) He further found that Simmons's asthma impairments, singularly or in combination do not functionally equal the Listing of Impairments. (*Id.*) Thus, the ALJ found that, based upon Simmons's SSI application filed on January 8, 2002, Simmons was not disabled within the meaning of the Social Security Act. (*Id.*)

5

*Section 103.03 of the Listing of Impairments*

Simmons contends that the ALJ did not properly evaluate the record in assessing whether his conditions meet § 103.03 of the Listing of Impairments for asthma. The ALJ noted that the medical records first show the possibility of a diagnosis of reactive airway disease when Simmons was 13-months-old and that he was subsequently diagnosed with asthma. (Tr. 13.) He also noted that Simmons's exacerbations of asthma decreased in frequency beginning in October 2001, consistent with the treatment of his symptoms with medication. (Tr. 14.) The ALJ analyzed Simmons's asthma under § 103.03(B) and § 103.03(C)(2) of the Listing for Asthma.

To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). The claimant bears the burden of proving his condition meets or equals a listed impairment. *Id*.

The Listing defines "asthma 'attacks'" as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting." 20 C.F.R. Pt. 404, subpt. P, App. 1 § 3.00(C). To meet Listing § 103.03(B), a child must have asthma with "attacks" in spite of prescribed treatment and requiring physician intervention, occurring at least once every two months or at least six times a year. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 103.03(B). Each

Case 2:04-cv-00381-RTR   Filed 03/31/06   Page 6 of 25   Document 22

inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks. (*Id*.)

The ALJ's decision lists 18 emergency department and hospital visits made by Simmons. (Tr. 14-15.) The list includes the date, treatment facility, and the diagnosis. (*Id*.) The ALJ identified May 11, 2001, as the only occasion when Simmons was diagnosed with, and treated, for asthma. (Tr. 15.) And, the ALJ found that asthma was a secondary diagnosis when Simmons was hospitalized from January 21 through January 23, 2002, for pneumonia. (*Id*.) (That hospitalization counts for two attacks under Listing § 103.03(B)).[4] Based on the medical record, the ALJ found that Simmons's asthma with three attacks did not meet the Listing requirement of at least six attacks in a 12-month period.

Simmons asserts that the ALJ's finding – that he did not meet § 103.03(B) of the Listing for Asthma – is not supported by substantial evidence. Simmons maintains that the ALJ did not properly include attacks or the occasions when Simmons's asthma flared. (Pl's Br. 8.) Simmons believes that, if properly counted, he had the requisite number of attacks to satisfy the Listing § 103.03(B) criteria. (*Id*.)

Simmons states that progress notes from an August 11, 2001, clinic visit reflect that he had an attack. (Pl.'s Br. 5 (citing Tr. 168).) The clinic progress notes indicate that

---

[4]Simmons argues that his January 21 through January 23, 2002, hospital admission should be counted as two attacks as defined in the § 103.03(B) of the Listings. (Pl.'s Br. 7.) Simmons's argument is moot since the ALJ did count the admission as two attacks. (*See* Tr. 15.)

7

Simmons was seen for complaints of congestion, coughing, "wheezing when coughing too much," and "picking" on his ears. (Tr. 168.) Wheezing and prolonged expiration was noted. (*Id*.) Simmons was diagnosed with sinusitis[5] and restrictive airway disease ("RAD"), and the clinic notes indicate that he was on an Albuterol nebulizer.[6] (*Id.*) Amoxicillin[7] was prescribed and Simmons was directed to return in one week. (*Id.*) The ALJ did not mention this clinic visit in his decision. Thus, the Court has no indication of the ALJ's consideration, if any, of the clinic visit.

While Simmons had a symptomatic episode and was placed on an antibiotic, the progress notes do not clearly indicate that the August 11, 2001, clinic visit should be considered an "attack" as defined in 20 C.F.R. Pt. 404, subpt. P, App. 1 § 3.00(C).[8] For example, the visit occurred in a clinic, not an emergency room or hospital and there is no indication that it was an "equivalent" setting. *See id.* The progress notes from the visit are

---

[5]Sinusitis is an inflamation of the paranasal sinuses. *The Merek Manual of Diagnosis and Therapy* ("*Merek Manual*"), 687 (Mark H. Beers, M.D., and Roberk Berkow, M.D., eds., Merck Research Labs. 17th ed. 1999).

[6]Albuterol is a beta-adrenergic bronchodilator which stimulates the enzyme that catalyzes the formation of cyclic AMP (cyclic 3', 5' - adenosine monophosphate). *See Physician's Desk Reference*, 3067 (60th ed. 2006). The increased cyclic AMP is associated with relaxation of bronchial smooth muscle and inhibition of release mediators of immediate hypersensitivity from cells. *Id.* A nebulizer is a device used to reduce liquid medication into extremely fine cloudlike particles; useful in delivering medication to deeper parts of the respiratory tract. Thomas Lathrop Stedman, *Stedman's Medical Dictionary*, 1184 (27th ed., Maureen Barlow Pugh sr. managing ed., 27th ed. Lippincott Williams & Wilkins 2000).

[7]Amoxicillin is an antibiotic to treat or prevent bacterial infections. *See Physician's Desk Reference*, *supra* note 6, 1315.

[8]If there is a conflict in the evidence, the plaintiff has the burden to prove he meets the eligibility requirements. *See Johnson v. Heckler*, 741 F.2d 948, 953 (7th Cir. 1984).

8

difficult to read and the Court cannot discern how long Simmons's experienced the symptoms – an attack under the Listing must involve a prolonged symptomatic episode lasting one or more days.  *See id.*

Simmons also notes he was seen at an emergency room on October 26, 2001, and was admitted to the hospital.[9]  (Pl.'s Br. 6 (citing Tr. 127 & 125-36).)  The medical records disclose that Simmons was seen at the Children's Hospital of Wisconsin's ("Children's Hospital") emergency room at 0734 hours and 1750 hours on October 26, 2001.  (Tr. 128-30; 259.)  At 0734 hours, Simmons was crying, had difficulty breathing, and was pulling his ear.  (Tr. 128.)  He was treated with ibuprofen.  (*Id.*)  Later that day, Simmons returned to the emergency room with a "barky cough," nasal congestion, and breathing through his mouth.  (Tr. 130.)  His chief complaint was a 103° F fever and "croup?"[10]  (*Id.*)  Tylenol was administered.  (*Id.*)  The diagnosis was pharyngitis,[11] viral syndrome and fever.  (*Id.*)  After being treated, Simmons went home.  (*Id.*)

---

[9]On page 126 of the transcript in the Court's file, the date is not decipherable.  The list of exhibits describes the medical records at pages 125-36 as records from "Hospital Admission 10-27-01 and Discharge 10-30-01 from Children's Hospital." (Tr. 3.)  Despite the transcript description, pages 128 and 130 are dated October 26, 2001.  (Tr. 128-30.)  The date on page 129 is undecipherable but the recorded information indicates states Simmons was seen that morning for a fever.  (Tr. 129.)

[10]Croup is an acute viral inflamation of the upper and lower respiratory tracts, characterized by inspiratory stridor, subglottic swelling, and respiratory distress which is most pronounced on inspiration.  *Merek Manual*, *supra* note 5, at 2333.  Stridor is a musical sound, audible without a stethoscope and is predominantly inspiratory.  *Id.* at 517.

[11]Phraryngitis is an acute inflamation of the pharynx.  *See Merek Manual*, *supra* note 5, at 690.

9

The ALJ's list of Simmons's hospital and emergency room visits includes an emergency room visit on October 26, 2001. (Tr. 14.) Simmons's medical records do not include evidence indicating that the October 26, 2001, emergency room visits should have been considered an asthma attack under 20 C.F.R. Pt. 404, subpt. P, App. 1 § 3.00(C). They also do not support Simmons's statement that upon his October 26, 2001, emergency room visit, he was admitted to the hospital.

However, on October 27, 2001, at 1308 hours, Simmons went to the Children's Hospital again and was admitted as an inpatient. (Tr. 263.) Based his white blood cell count of 32,000 and the results of a chest x-ray, Simmons was diagnosed with viral pneumonia.[12] (Tr. 261.) During his three-day hospital stay, Simmons underwent the "respiratory protocol for asthma" including nebulizations with prednisone,[13] Pulmicort Respules,[14] continuous pulse oximetry monitoring, and oxygen. (*Id.*) He also received cefotaxime.[15] (Tr. 262.)

---

[12]The treatment protocol for viral pneumonia summarized in *The Merek Manual of Diagnosis and Treatment* does not suggest asthma therapy. *See Merek Manual*, *supra* note 5, at 612.

[13]Prednisone is an oral steroid. *See* http://www.drugs.com/data/_pop1cfm?htm (search "Prednisone.")

[14] Pulmicort Respules are used for inhalation by compressed air driven nebulizers. *Physician's Desk Reference*, *supra* note 6, at 654. The active ingredient in Pulmicort Respules is Budesonide, an anti-inflamatory corticosteroid used to treat asthma. *Id.*

[15]Cefotaxime, an antibiotic, is used to treat infections. The drug is either injected or added to intravenous fluid. *See* http://www.nlm.nih.gov/medlineplus/druginformation.html. (search "Cefotaxime," then click on "Cefotaxime Sodium Injection" under Drugs & Supplements).

Simmons responded to the treatment and was discharged on October 30, 2001, in stable condition on a 10-day course of Augmentin[16] and Pulmicort. (*Id.*)

The ALJ's list of Simmons's hospital and emergency room visits includes a hospitalization from October 27, through October 29, 2001.[17] (Tr. 14.) But, the ALJ's decision is silent regarding his rationale for concluding that the hospitalization, which exceeded 24 hours, was not an attack or two attacks under Listing § 103.03(B). Nonetheless, even if the ALJ had counted the October 2001, hospitalization as two attacks, the medical record does not disclose a sixth attack within a 12-month period. A showing of six attacks is required to meet Listing § 103.03(B) for asthma. Thus, substantial evidence supports the ALJ's conclusion that Simmons did not meet Listing § 103.03(B). *Maggard*, 167 F.3d at 380.

Simmons also states that the ALJ failed to properly analyze and characterize his January 27, 2001, and January 15, 2002, emergency room visits. On January 27, 2001, at the age of four months, Simmons was seen at the Children's Hospital emergency room due to a three-day-old cough, irritability, and rhinorrhea.[18] (Tr. 196-97.) Diagnosed with

---

[16]Augmentin is an oral antibiotic combination consisting of amoxicillin and clavulanic acid, which protects the amoxicillin from degradation by ß-lactamase enzymes. *Physician's Desk Reference*, *supra* note 6, at 1334-35.

[17]The ALJ's list omitted the day, October 30, 2001, which was a part of the October 2001, hospitalization.

[18]Rhinorrhea is discharge from the nose. Stedman, *supra* note 6, at 1567.

11

broncholitis,[19] he was treated with nebulized albuterol and improved, though he still had some occasional expiratory wheezing. (Tr. 196.)

In his decision, the ALJ addressed such emergency room visit and found that Simmons had been treated for bronchiolitis. The record contains substantial evidence to support the ALJ's characterization of the January 27, 2001, treatment. This Court does not re-weigh evidence, and insofar as there is substantial support for the ALJ's determination, it will stand. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

On January 15, 2002, Simmons was treated at the Children's Hospital emergency room for complaints of vomiting and fever. (Tr. 153-159.) His grandparents reported that he had wheezing, a cough, and respiratory distress for a few days. (Tr. 158.) Earlier that day, Simmons's primary care physician examined him and referred him to the emergency department because of an elevated white blood cell count. (*Id*.) Simmons's treatment included administration of cefotaxime. (*Id*.) A chest x-ray revealed interstitial prominence and atelectasis which could "reflect a viral process or reactive airway disease." (Tr. 159.) The diagnosis was "viral illness." (Tr. 155.)

The ALJ, in his decision, acknowledged both this visit and the assigned diagnosis. (Tr. 14 & 15.) The ALJ reasonably found that Simmons had a viral illness. This

---

[19]Bronchitis is an acute viral infection of the lower respiratory tract affecting infants and young children and characterized by respiratory distress, expiratory obstruction, wheezing, and crackles. *See Merek Manual*, *supra* note 5, at 2335.

12

conclusion is consistent with the medical record, *see* Transcript 155, is supported by substantial evidence and must be upheld. *Dixon*, 270 F.3d at 1176.

Simmons also contests the ALJ's conclusion that Simmons's impairments do not meet Listing § 103.03(C). Listing § 103.03(C) provides:

> Persistent low-grade wheezing between acute attacks **or** absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with **one** of the following:
> 1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; **or** 2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period; . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 103.03(C) (emphasis added).

Simmons contends that the ALJ misread § 103.03(C) of the Listing. (Pl.'s Br. 5 (citing Tr. 16).) He indicates that the ALJ erroneously determined that the absence of evidence of "persistent low-grade wheezing" defeated Simmons's claim because the ALJ failed to note the "'or' between paragraphs B and C of the [L]isting." (Pl.'s Br. 5.)

To the extent that Simmons contends the ALJ erred interpreting subsection (C) of § 103.03 of the Listing as requiring **both** persistent low-grade wheezing between acute attacks **and** the absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators, Simmons's argument is supported by *part* of the ALJ's discussion of the requirements of Listing § 103.03(C). At page 16 of his decision, the ALJ states that Listing § 103.03(C) requires "evidence of persistent low-grade wheezing

13

requir[ing] daytime and nocturnal use of sympathomimetic bronchodilalators together with evidence of oral steroid use that averages more than 5 days per month for at least three months."  However, the ALJ's discussion of Listing § 103.03(C) begins on page 15 by correctly stating that to satisfy the first clause of that subsection, a child must have either persistent low-grade wheezing between acute attacks **or** the absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators.  (*See* Tr. 15.)  Thus, the ALJ's understanding of the Listing § 103.03(C) requirements may be open to attack depending on which portion of his decision is scrutinized.

However, precisely what the ALJ understood is not material to the analysis of Simmons's impairment under Listing § 103.03(C).  The Listing specifies that if a child has either the requisite wheezing **or** the specified absence of symptom-free periods, then the child must **also** meet the requirements of either (C)(1) or (C)(2) of Listing § 103.03.  Only Listing 103.03(C)(2) is at issue.[20]

Addressing oral steroid usage as specified in § 103.03(C)(2) of the Listing for asthma, the ALJ noted Simmons's claim that he required oral steroids on January 27, 2001, May 11, 2001, May 17, 2001, August 18, 2001, October 27, 2001, and January 16, 2002.  (Tr. 15.)  The ALJ found that Simmons only required oral steroids (prednisone) for asthma

---

[20]Listing § 103.03(C)(1) requires that the medical record disclose "[p]ersistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 103.03(C)(1).  Simmons does not contend that his medical record contains such evidence.

14

on one occasion, August 18, 2001. While Simmons takes issue with the ALJ's explanation of the Listing § 103.03(C), he does not analyze the ALJ's determination that Simmons did not meet the oral steroid usage requirement.

In his decision, the ALJ determined that although Simmons was prescribed a five-day course of prednisone on January 27, 2001, the diagnosis was bronchiolitis, not asthma. (Tr. 15, *See* Tr. 196.) The ALJ also found that while Simmons received prednisone on January 16, 2002, that medication was administered to remedy a diagnosed viral illness. (Tr. 15, *See* Tr. 155.)

This Court's role is not to re-weigh evidence. *Dixon*, 270 F.3d at 1176. If the ALJ's decision is supported by substantial evidence, it must be upheld by this Court. There is substantial evidence that Simmons's use of prednisone did not meet the Listing level of oral steroid use averaging more than five days per month for at least three months. *See* Listing, § 103.03(C)(2). Thus, the Court will uphold the ALJ's finding that Simmons's impairment does not meet Listing § 103.03.

*Evaluation of Treating Source Opinions*

Simmons also contends that the ALJ did not properly evaluate treating source opinions. Simmons relies upon the standard set forth in 20 C.F.R. § 404.1527(d) (for SSI cases, the same standard is found at 20 C.F.R. § 416.927(d)) and the criteria for evaluation of medical evidence as described in Social Security Ruling ("SSR") 96-2p.

15

The stated purpose of Social Security Ruling 96-2p is "[t]o explain terms used in [the] regulations on evaluating medical opinions concerning when treating source medical opinions are entitled to controlling weight, and to clarify how the policy is applied." The ruling states:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

SSR 96-2p (emphasis added). Thus, under the ruling, a treating source's medical opinion only need be given controlling weight by the Commissioner or her representative when that

16

opinion is well-supported and is not inconsistent with the other substantial evidence in the case record.

Simmons maintains that the ALJ failed to properly evaluate treating source, Dr. Susan Higgins ("Higgins"), an allergist, and improperly gave greater weight to the medical evidence provided by Dr. Martin Lobel ("Lobel"), another allergist. (*See* Pl.'s Br. 9-10.) He also contends that the ALJ failed to note that Dr. Marie Baylon's ("Baylon") opinion mirrored that of Higgins regarding Simmons's need to be at home with James.

Baylon, one of Simmons's primary care physicians since birth, *see* Transcript 87, completed a State of Wisconsin Department of Workforce Development "Need to Care for Disabled Family Member" form, dated February 26, 2002. That form indicates that James needed to care for Simmons as a result of his incapacitation/disability due to asthma. (Tr. 282.) Baylon indicated that James needed to watch for respiratory distress and to administer medications every four hours as needed. (*Id.*)

Lobel first examined Simmons on March 22, 2002. (Tr. 228.) He determined that "symptomatic medication, only was indicated." (*Id.*) Lobel increased the dosage and frequency of Pulmicort nebulizations to twice daily, and maintained the dosage and thrice daily administrations of albuterol by nebulizer. (*Id.*) With the family, Lobel reviewed the proper use of oral steroids and emphasized that they should notify him promptly at the onset of an asthma flare, so he could prescribe remedial steroids to resolve the exacerbation and avoid Simmons's hospitalization. (Tr. 229.)

17

On May 29, 2002, James reported to Lobel that Simmons was doing better with the increased Pulmicort, and he was not experiencing any significant coughing or wheezing, and had not been hospitalized since his last examination. (Tr. 284.) She said that Simmons occasionally coughed with very strenuous running. (*Id.*) Upon examination, Simmons's chest was clear to percussion and auscultation. (*Id.*) Wheezes, rales and rhonchi were absent. (*Id.*) The expiratory phase was not prolonged and there were no retractions or flaring. (*Id.*)

Thereafter, on June 18, 2002, James reported to Lobel that Simmons was doing very well overall. (Tr. 283.) Simmons was not wheezing or coughing significantly. (*Id.*) Sometimes with running, Simmons coughed and James gave him albuterol. (*Id.*) Lobel's physical examination of Simmons was unremarkable. Lobel directed James to administer albuterol before Simmons engaged in strenuous activity and to continue the medication regimen. (*Id.*)

Higgins's initial evaluation of Simmons was on November 11, 2002. (Tr. 295-96.) At that time, Simmons was 2½-years-old. (Tr. 295.) She noted that his current medications included Pulmicort Respules (two times per day) and albuterol (three times per day) in the nebulizer, and Singulair[21] in the evening. (*Id.*) She noted that his height, weight, and developmental milestones were "apparently on track" and that Simmons was a pleasant

---

[21]The active ingredient in Singulair, monotelukast sodium, is a selective and orally active leukotriene receptor antagonist that inhibits the cysteinyl leukotriene $CysLT_1$. *The Physician's Desk Reference*, *supra* note 6, at 2047. The CysTL type-1 ($CysLT_1$) receptor is found in the human airway and CysTLs have been correlated with the pathophysiology of asthma. *Id.* at 2047-48.

18

and cooperative toddler. (Tr. 295-96.) She reported that Simmons's chest was completely clear and his respirations were "unlabored." (Tr. 296.) She found that Simmons had "moderate persistent allergic and viral-induced asthma, which is apparently labile." (*Id*.) Higgins indicated that she was waiting for Simmons's medical records and that, if they confirmed James's recitation of his medical history, she would recommend no daycare in the winter. (Tr. 299.)

      On December 6, 2002, Higgins completed a State of Wisconsin Department of Workforce Development "Need to Care for Disabled Family Member" form indicating that Simmons was incapacitated/disabled due to "asthma, hospitalized last winter." (Tr. 300). For that winter, she recommended no daycare for Simmons in the colder months of October through March. (*Id*.) Higgins sought to minimize exposure to infections which triggered Simmons's asthma flares. (*Id*.)

      Higgins conducted a follow-up examination of Simmons on December 20, 2002. She found that he had acute sinusitis, causing a mild flare-up of his asthma. (Tr. 298.) She prescribed Augmentin twice a day for 14 days, in addition to his regular asthma medications. (*Id*.) At that time, Higgins noted moderate/severe persistent asthma. (*Id*.)

      The ALJ discounted Higgins's opinion that Simmons needed to stay out of daycare from October through March due to severe to moderate asthma. The ALJ explained his reasoning: Higgins only saw Simmons twice before completing the form and did not have a longitudinal relationship with him. (Tr. 17.) He stated that, at the first appointment,

19

Higgins only tested Simmons for allergies. (*Id*.) At the second appointment, although Simmons had sinusitis, he was not in acute distress, and was active and playful. (*Id*.) Thus, the ALJ determined that Higgins's opinion was not supported by objective findings. (*Id*.) Furthermore, Higgins's opinion regarding daycare was rendered for the State of Wisconsin, Wisconsin Back to Work Program, not for the purposes of evaluating Simmons's SSI claim. (*Id*.)

While Simmons disagrees with the weight accorded to Higgins's opinion, the ALJ articulated his reasons for discounting the evidence. The ALJ reasonably found that Higgins did not have a longitudinal relationship with Simmons. The introduction to Listing § 103.03 explains that a longitudinal record provides information about the ongoing medical severity of the impairment, the level of the child's functioning, and the frequency, severity, and duration of symptoms. The ALJ also reasonably found that Higgins's objective findings based on her examination of Simmons did not support her opinion. Simmons has provides no authority indicating it was improper for the ALJ to consider the purpose for which Higgins rendered her opinion. The weight accorded to medical opinions is a matter to be determined by the ALJ, and there is substantial evidence to support the ALJ's assessment of Higgins's opinion. *See Dixon*, 270 F.3d at 1177-78.

Simmons is correct that the ALJ did not mention Baylon's recommendation that Simmons remain out of daycare. However, this omission is not significant. An ALJ need not articulate consideration of every piece of evidence. *Herron v. Shalala*, 19 F.3d 329,

20

333 (7th Cir. 1994). The ALJ relied heavily upon the progress notes of Baylon and her clinic colleagues, Dr. George V. Chandy ("Chandy") and Dr. Reena George ("George"). Baylon's daycare opinion also preceded Lobel's treatment of Simmons – which brought his asthma under better control.

*Credibility Evaluation*

Simmons also asserts that when considering James's credibility, the ALJ did not comply with Social Security Ruling ("SSR") 96-7p[22] which sets forth criteria for the evaluation of credibility. (Pl's Br. 11.) He also states that it is difficult to find a credibility determination. (*Id.*)

_____

[22]Social Security Ruling 96-7p states:

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Case 2:04-cv-00381-RTR   Filed 03/31/06   Page 21 of 25   Document 22

Though not set forth in a separate finding, the ALJ's decision is threaded with assessments of James's credibility. In some instances, the ALJ credited her testimony. For example, in considering Simmons's ability to interact and relate to others, the ALJ summarized the documentary evidence indicating that Simmons's ability to interact with, and relate to others, was unimpaired, he also noted that James testified at the hearing that Simmons gets along with his parents and siblings. (Tr. 13.) Obviously, the ALJ found that James's testimony squared with other evidence and he credited it.

Another example of the ALJ's credibility assessment is presented by his discussion of James's testimony that Simmons's asthma was diagnosed when he was 1-month-old. (*Id*.) The ALJ found James's testimony to be inconsistent with the medical evidence which first showed "the *possibility* of a diagnosis of reactive air[way] disease when Simmons was 13 months old. (*Id.*) The ALJ clearly found James's testimony on the timing of the asthma diagnosis not credible.

The ALJ assessed the credibility of James's testimony on multiple issues, sometimes crediting, and other times discounting her testimony. "[W]here the reasoning of the ALJ's decision is apparent, [reviewing courts do not require] the ALJ to articulate explicitly his credibility determinations." *Abrogast v. Bowen*, 860 F.2d 1400, 1406 (7th Cir. 1988). In his credibility determination, the ALJ cited multiple factors identified in SSR 96-7p. The ALJ cited written reports of daily activities, Simmons's medications, and factors

22

which precipitated and exacerbated his attacks.  Not all the factors cited in SSR 96-7p[23] are implicated by Simmons's condition or relevant to James's testimony.  The ALJ's credibility determination is due special deference.  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).  It is not "patently wrong" and will not be overturned.  *See Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004).

*Medical and Functional Equivalence*

Simmons argues that the ALJ did not properly evaluate the medical and functional equivalent of the Listings.  (Pl.'s Br. 14.)  He maintains that, because the ALJ's assessment of the evidence was erroneous, the ALJ's functional evaluation is not supported by substantial evidence.  (*Id.*)

This decision has analyzed Simmons's specific contentions regarding the ALJ's assessment of the evidence.  None of those contentions was persuasive.

Addressing medical equivalence, if a claimant does not exhibit one or more of the medical findings specified in a particular listing, or exhibits all of the medical findings, but one or more is not as severe as specified in the listing, the SSA "will nevertheless find that [the] impairment is medically equivalent to that listing if [the claimant has] other medical findings related to [his] impairment that are at least of equal medical significance." 20 C.F.R.

---

[23]Albeit that courts routinely accord considerable deference to an agency's interpretation of its own regulations, social security rulings are binding on the Commissioner and not on the court.  *See Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

Case 2:04-cv-00381-RTR   Filed 03/31/06   Page 23 of 25   Document 22

§ 416.926(a)(1).  Medical equivalence must be based on medical findings that are at least equal in severity and duration to the listed findings.  *Id*.

The ALJ's finding that Simmons's impairment(s) do not meet or equal any impairment in the Listing of Impairments is supported by the findings of non-examining agency physicians.  Such findings were made by Dr. Irene M. Ibler ("Ibler") on February 27, 2001, and affirmed by Dr. Milford Schwartz ("Schwartz") on March 11, 2001.  (Tr. 116- 24.) Simmons' impairments were also evaluated by Ibler on April 24, 2002, and Dr. Mary N. Harkness ("Harkness") on August 8, 2002.  (Tr. 215-20.)  Upon review of the record, the physicians concluded that Simmons's impairment(s) did not meet or equal the listings.  Such findings constitute substantial evidence to support the ALJ's determination.  *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

The ALJ's decision also addresses functional equivalence by throughly examining all six functional domains. (Tr. 12-13, 16-17).  The ALJ devotes a comprehensive paragraph to each domain.  In his discussion of the domains, the ALJ relies upon evidence derived from records of Simmons's routine examinations by his primary care physicians who recorded Simmons's growth and development, and records from the Children's Hospital. The ALJ also relies upon some of James's hearing testimony and the daily activities reports completed by James and Simmons's grandmother.  Non-examining physicians, Ibler, Schwartz and Harkness also evaluated the effect of Simmons's impairments in the six

24

relevant domains and determined that they were not the functional equivalent of a listed impairment. (Tr. 215-20.)

The ALJ's determination that the Simmons's impairments do not cause any limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects and caring for oneself; and that said impairments demonstrate a less than marked to marked limitation in the area of physical health and well-being is supported by substantial evidence. The Commissioner's decision is supported by substantial evidence and is affirmed.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Simmons's appeal from the Commissioner's final decision is **DENIED**. The Commissioner's final decision finding that Simmons is not disabled due to asthma based on Simmons's January 8, 2002, application for SSI is **AFFIRMED**.

This action is **DISMISSED**.

The Clerk of Court **SHALL** enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2006.

**SO ORDERED,**


**s/ Rudollph T. Randa**
**HON. RUDOLPH T. RANDA**
**Chief Judge**

25